Pedro CASTRO et al.

v.

Nancy BEECHER et al.

Civ. A. No. 70–1220.

United States District Court,
D. Massachusetts.

April 15, 1973.

Rehearing Denied May 7, 1973.

John F. McGarry, Asst. Atty. Gen., for the Civil Service defendants.

Richard A. Howard and John F. Dargin, Jr., Boston, Mass., for intervenors.

Nicholas Foundas, Boston, Mass., for defendant Police Commissioner of City of Boston.

Thomas A. Mela and Patrick J. King, Boston, Mass., for plaintiffs.

## OPINION

### On Motions for Approval of Consent Decree

WYZANSKI, Senior District Judge.

This case is before the Court on a motion made by *all* the parties and intervenors. It seeks the Court's approval of a decree in the form set forth in Appendix A, to which everyone of them has consented in writing.

Unlike most consent decrees, it has been preceded by full hearings, findings of fact, conclusions of law, and several opinions in 1971 by this court, reported in 334 F.Supp. 930, and two opinions of the Court of Appeals delivered in 1972.

Plaintiffs, a class of blacks and Spanish-speaking persons, hereafter for brevity sometimes called merely "blacks", complained that the Massachusetts Civil Service Commissioners discriminated against them in setting civil service examinations preliminarily to certifying candidates for appointment by cities, towns, and state agencies, in violation of the Fourteenth Amendment to the United States Constitution's guarantee of equal protection under the laws, and in violation of the Civil Rights Act codified in 42 U.S.C. § 1983.

Ample opportunity was expressly afforded in this court in 1971 for intervention. Advantage was taken of this by persons who were without exception allowed to intervene upon request. By the most widespread publicity in 1971, 1972, and particularly in 1973, all media of communication drew the public's attention to this litigation. The press, the radio, and the television stations in their reports indicated that the Attorney General of Massachusetts, members of the Massachusetts legislature, and some individuals contemplated intervention. This court allowed the time between the discussion of a possible compromise first set forth in open hearing on March 27, and fully discussed thereafter in the Massachusetts legislature, and debated by columnists and correspondents in the press, and the time of the formal presentation of the compromise in open court on April 13, 1973, for possible intervention. Despite the barrage of publicity, which, to say the least, raised every possible real or fanciful objection, no one who had not previously appeared sought intervention. Nonetheless, those who were already parties or intervenors brought to the court's attention in public proceedings every kind of potentially relevant factor.

The matter is now ripe for action.

In 1972 the Court of Appeals overruled this court's 1971 determination that *no* black or white should have priority of any kind. It had been this court's judgment that the only relief to which plaintiffs were entitled was (1) the setting aside of the results of three examinations which the Civil Service Commission itself had admitted in court were discriminatory, and (2) the ordering of the Civil Service Commission to design and conduct new examinations which would be open to all, with no one, regardless of ethnic or other considerations, entitled to favor or any kind of preference of any sort.

The Court of Appeals, disagreeing with this court, directly commanded that a first priority be given to Blacks and Spanish-speaking persons who should *pass* a new properly designed non-discriminatory examination, and that a second priority be given to those (who happened to be virtually in each instance white persons who were not Spanish-Americans) who previous to 1972 had passed the admittedly discriminatory examinations. That Court also suggested, but did not command, possible ratios between those two priority groups, which are called in the Draft Decree presented by the parties and intervenors, Group "A" and Group "B".

The Draft Decree conforms in its Groups A and B to the judgment of the Court of Appeals.

No objection has been made to that aspect of the Draft Decree. The only objection which this Court can imagine *might* have been made, but was not in fact made, would be by a black who did *not* pass the 1972 Civil Service examination, and who therefore did not come within Group A.

There has been considerable public misunderstanding as to the possible claim of such a black. This court confesses that its own lack of clarity contributed to that confusion. Others who failed to read the whole record consecutively, but who picked out of context particular remarks, did their share in promoting confusion.

Chronologically, the first point to be made about the hypothetical black who did not pass the 1972 examination is that, by necessity, he must be supposed to be a person with a high school diploma or its equivalent. In the most explicit terms, in a passage several paragraphs in length, this court ruled in 1971 in its published and unaltered opinion, that only high school graduates or their equivalent were eligible to become police patrolmen. This is the valid Massachusetts statutory rule. It conforms to national standards. And what this court ruled on this point was affirmed in 1972 by the Court of Appeals. It is hard to see how in good faith any informed person, whether party, intervenor, counsel, journalist, correspondent, or legislator could ever have supposed

that this court was being asked in 1973 to consider, or contemplated in 1973 considering, the appointment to the police forces of a candidate who could not read or write, or reach in all respects the level of a high school graduate.

The second point to be made about the hypothetical black who did not pass the 1972 examination is that, admittedly, he could prove, not just assert, that the Civil Service Commission did not comply with the decrees of this court in 1971 and of the Court of Appeals in 1972 in setting that examination. Without ambiguity, both courts commanded the Civil Service Commission to design a new examination. Confessedly, the Commission offered a hodge-podge of old examinations. Even if this paper-and-paste assembly could be construed as a novel combination, the several parts were obsolete and did not purport to be related specifically to the police patrolman's job. At best this examination tested qualities possibly relevant to a candidate for a low level position in the desk occupations of the white-collar persons employed in the federal bureaucracy.

The third point to be made is that at one early stage of the open court proceedings on March 27, a lawyer suggested on his own initiative that the hypothetical black who failed the 1972 examination and his 55 or so colleagues, in view of the impropriety of the 1972 examination and his proven ability as a high school graduate to pass a fair examination, be treated as though he had in fact passed a valid examination.

What this proposal sought to accomplish was the avoidance of a cancellation of all the results of the 1972 examination and an immediate appointment of those who had long been awaiting positions to which they, under the decree of the Court of Appeals, were entitled because they had already passed pre-1972 examinations. This proposal was designed to help the local authorities make not merely temporary appointments to the police (a right which they had always retained and exercised without let or hindrance by any injunction or judicial restraint) but also hundreds of permanent appointments.

Recognizing the obvious appeal of this proposal initiated by others, this court later in the hearing proposed that the parties and intervenors during a 10 day adjournment should *voluntarily* consider as a *feature* of a possible overall compromise that blacks who took but did not pass the 1972 Civil Service Examination should be certified by the Commission.

Such proposal was *not* an order commanding the certification of such blacks. This court would have lacked the power to issue such an order. Moreover, in the clearest terms in 1971 this court had ruled, and had never changed, or contemplated changing, its ruling that the United States Constitution's Equal Protection Clause does not authorize quotas based on ethnic considerations or any comparable priority except in the most unusual situations, of which this obviously was not one, at least in this court's opinion (before it was otherwise instructed in 1972 by the Court of Appeals).

At the same time that the court proposed discussions between the parties and intervenors, the court noted how dilatory and otherwise obdurate had been the Civil Service Commission. The court indicated that the obduracy of the Commision *might* induce the court to appoint a receiver. See opinion March 22, 1973. Explaining how inadequate any purely legal-judicial remedies might be because of the limitations of the constitutional remedies and because of the restrictions upon judicial power, even when exercised by activist judges, this court entered on March 28 a Memorandum as a reflection intended to aid the parties in reaching a compromise. See Memorandum dated March 28, 1973.

It now appears from the Draft Decree presented April 13, 1973 to this court, that the parties and intervenors do not want to have included in the Decree any

special priority for black high school graduates or others who did not pass the 1972 examination.

This court surely does not object. It *never* thought it had the constitutional right to order such a provision. It only proposed that the provision which had been initiated by others be considered. As a voluntary compromise, it has been considered. It has been rejected. And that's that.

Nor can valid objection to the omission be made by any black who took and failed the 1972 examination. Such a hypothetical person is represented by competent counsel who on his behalf has recognized he has no legal or constitutional claim. Furthermore, and this is very significant, even if this court were to set aside, as not complying with the decrees of the District Court and the Court of Appeals, the 1972 examination, the hypothetical black would be no better off. In its 1972 opinion the Court of Appeals gave to those who passed the invalid pre-1972 examinations a priority over all who passed subsequent examinations, with one exception. An even more favorable priority was given by the Court of Appeals to those black and Spanish-speaking persons who had passed pre-1972 invalid examinations or who had taken but failed pre-1972 invalid examinations and who should thereafter pass a 1972 examination.

If that Court of Appeals precedent represents principle, then clearly the black who failed the 1972 examination is not to be considered until consideration is exhausted with respect to (1) blacks who took pre-1972 examinations and passed them, and (2) blacks who took pre-1972 examinations and failed them but who later passed the 1972 examination. Perhaps the situation is different with respect to what might have been claimed on behalf of a potential priority of a black who failed the 1972 examination but who should pass a subsequent, let us say, 1973 examination and who asked to be considered before a non-black who had passed either (1) a pre-1972 examination or (2) the 1972 examination. Such subtleties may belong in the Internal Revenue Code. They are too refined to be used in the practical business of quickly putting to work the police patrolmen this Commonwealth immediately needs. In such emergencies there must be a recognition that of all priorities the first is the common defense against the enemy abroad or at home in our streets.

Next there is to be considered that part of the submitted Draft Decree which gives a secondary priority to those who passed pre-1972 examinations. This provision conforms to the judgment of the Court of Appeals.

Neither there nor elsewhere are veterans' statutory preferences denied. There is specific preservation of those and like rankings in accordance with existing Massachusetts law. Representations to the contrary are not correct.

We turn now to the submitted Draft Decree's proposed Group "C". This establishes a tertiary priority for black and Spanish-speaking persons who took a police examination for the first time in 1972 and successfully passed it. From earlier discussion in this opinion it is evident that this group is exclusively composed of persons who have a high-school diploma, or an equivalent education, or a waiver granted by the Massachusetts legislature.

It is evident that persons in Group "C" measure up *prima facie* to reasonable requirements for the job of police patrolman. That important public office requires character, competence, common sense, comradeliness, and a community sense of responsibility. The policeman must radiate an authority which is enveloped in friendliness and fairness.

Generally, a policeman's appropriate first resort is to persuasion, not coercion. The billy and the gun are reserved for the violent, the vicious, the recalcitrant. Temperamentally, the ideal policeman is a gentleman aiding the whole society to be gentle in its compassion and culture. When the young, the

aged, the disabled need help, whether in the form of physical escort, or intelligent counsel, or moral strengthening, or comfort in troubled hours, the policeman may be, because of his heroic role and his good humor, an indispensable community companion.

In technical proficiency, the policeman's first quality is ability to communicate simply, clearly, convincingly. Whether he is directing traffic, or requiring trespassers to move away from a restricted area, or reporting, orally or in writing, to a superior or other person, conduct or incidents which the policeman observed, or presenting charges to or testifying in a court, a policeman must be reasonably fluent and altogether comprehensible.

A policeman must have a broad, but not necessarily detailed, knowledge of the constitutional, statutory, and local regulatory laws and ordinances he must apply. In today's climate he must have a more precise knowledge of the Constitution's Bill of Rights, and of the liberties, rights, privileges and immunities of the citizen and of the alien, of the public official and of the private person, of the conformist and of the dissident.

This bewildering diversity of demands upon the police is beyond complete satisfaction by any one policeman. Probably it is more difficult to satisfy all the demands if the police are drawn predominantly from one or two ethnic groups. A policeman of one background communicates more easily with persons who share his background, or whose background is familiar to the policeman. Not only is there readier communication, but also more sympathetic understanding. It is statistically proven that when a population is composed of Groups X, Y, and Z, and the police are predominantly drawn from Groups X and Y, the arrest and conviction record of persons in Groups X and Y is markedly lower than in Group Z, particularly with respect to so-called "victimless crimes", including consensual sexual misconduct, gambling, possession of drugs, undisciplined use of intoxicating liquor, inde-

cent dress or behavior. That is not because persons in Groups X and Y are in fact better behaved than persons in Group Z; the former have more policemen who have a friendly, compassionate, sympathetic understanding of X's and Y's than of Z's. The Greek word from which is derived the English word "barbarian" means a foreigner whose language and customs differ from the speaker's. Most persons are only too ready to treat the stranger as suspect, and even as subversive of the good order of society. It is through intimate association we learn that under different skins all men are brothers.

Considerations of that nature make it desirable in the public interest that, in their important role in the governance of society, policemen should be drawn from all groups. This does *not* imply that any group is entitled to a quota, nor to a fraction roughly corresponding to the fraction of the total population which belong to that group.

The record of the 1971 hearings in this case show that the Massachusetts Civil Service Commission, and most of the cities, towns, and state agencies have, albeit unintentionally for the most part. discriminated in recruiting police. Policemen of one background naturally and often unconsciously recruit new candidates from their own background. The deepest thrust of any recruiting effort comes not from public advertising but from the private encouragement of friends and acquaintances. Nor is the solicitation exclusively verbal. Each responds to the images created by the heroes of his own background. For a person in one group the *beau ideal* is a policeman. For a person in another group it is a teacher or a soldier.

To counteract the unconscious lopsidedness of the recruitment of the past, the parties and intervenors have proposed in their Draft Decree to give a tertiary priority to blacks and Spanish-speaking persons who have shown themselves qualified by passing the 1972 examination and, usually, by securing high school diplomas. This court re-

gards this wholly voluntary proposal as being in the public interest.

As of today there is not in this case any written objection of the kind which is required by the rules of the United States District Court for the District of Massachusetts, and which, in an opinion filed April 12, 1973, Chief Judge Caffrey ruled to be mandatory. But if this court, at least for the sake of assuring everyone that the court is not prejudiced against or in favor of any group, considers as a possible point that in creating Group "C" the parties and intervenors who now propose the Draft Decree here under analysis acted illegally, that point is easily answered.

What the creation of Group "C" does is to remedy the grievance each person in that group suffered because prior to 1972 the Civil Service Commission defendants did not in a nondiscriminatory manner seek to recruit that particular aggrieved person, and did not offer him the attraction of a nondiscriminatory competitive examination for the position of patrolman.

In short, persons in Group "C" have a compelling legal claim prior in right to those in Group "D." The provision creating Group "C" is not an example of Orwellian justice which treats some as more equal than others. Nor is it, as some commentators have wrongly supposed, a correction of historic injustice suffered by the ancestors of persons in Group "C". It is nothing more than, in Justinian's celebrated phrase, giving each man his due.

This court has not neglected certain observations made in open court Friday, April 13, by co-counsel associated with one of the counsel who signed the motion and prepared the Draft Decree now under consideration. In reply to what was asserted, these points may be made:

■ 1. The proposed decree does not violate Massachusetts law. The decree makes effective the guarantee in the United States Constitution of the equal protection of the laws. The United States Constitution is part and parcel of the law of Massachusetts. Indeed under Article VI of the United States Constitution it is the supreme part.

2. Veterans' preferences are preserved by the proposed decree.

3. No command in this court under the proposed decree is directed at any appointing authority, or mayor, or selectman, or commissioner of police, or chief of police. The only one of them that is even a party to this case is the commissioner of police of the city of Boston. And in 1971 this court sought to dismiss him. But, for reasons satisfactory to it, the Court of Appeals put him back in the case as a defendant.

## Order April 15, 1973

So much misinformation has been spread about this case and this court's attitude that it is hereby ordered that the defendant Civil Service Commission shall before May 1, 1973 mail (1) to every person who took the 1972 civil service examination and (2) to every appointing authority in the Commonwealth that in 1971, 1972, or 1973 requested certification of police patrolmen or equivalents, and (3) to the chief of police of every city and town in Massachusetts—the complete, unabridged text of this opinion and order together with attached exhibits.

Finding that the proposed decree is just, reasonable, and in the public interest, and more likely than any other proposed solution to give the people of the Commonwealth of Massachusetts effective, non-discriminatory, dedicated, and honorable police forces, the proposed decree is approved and entered this day.

## APPENDIX A
### CONSENT DECREE AND FINAL JUDGMENT

Upon the basis of the evidence, the judgment of this Court, dated November 17, 1971, as modified on December 6, 1971, and the mandate of the Court of Appeals, dated April 26, 1972, as amended May 24, 1972, and with the assent of

counsel, the Court hereby dissolves all outstanding injunctions and enters this Consent Decree and Final Judgment.

Now, therefore, it is ordered, adjudged and decreed by the Court as follows:

## I. *Certifications*

1. The defendant Director of the Massachusetts Division of Civil Service, the defendant Massachusetts Civil Service Commissioners, and their successors in office shall promptly commence certifying police applicants as eligible for appointment for each police department subject to Civil Service. For each police department a pool of eligible police officer candidates shall be established, and candidates certified in the following manner:

i. Group A shall consist of all black and Spanish-surnamed applicants who failed any of the 1968–70 Police Entrance Examinations, but passed the 1972 Interim Police Entrance Examination and are otherwise qualified for appointment on the basis of existing requirements. Said candidates shall be ranked in accordance with existing Massachusetts law.

ii. Group B shall consist of all persons currently on eligibility lists established on February 4, 1970, August 27, 1970, and March 26, 1971. Said candidates shall be ranked in accordance with existing Massachusetts law.

iii. Group C shall consist of all black and Spanish-surnamed persons, excluding those in Group A, who passed the 1972 Interim Police Entrance Examination and are otherwise qualified for appointment on the basis of existing requirements. Said candidates shall be ranked in accordance with existing Massachusetts law.

iv. Group D shall consist of all other persons, excluding those in Groups A, B and C, who passed the 1972 Interim Police Entrance Examination and are otherwise qualified for appointment on the basis of existing requirements. Said persons shall be ranked in accordance with existing Massachusetts law.

v. In response to requisitions submitted by police departments, candidates shall be certified to such departments on the basis of one candidate from Group A for every candidate certified from Group B until the list of candidates in Group A is exhausted.

vi. Upon the exhaustion of Group A, candidates shall be certified to requisitioning police departments on the basis of one candidate from Group C for every three candidates certified from Group B, until the candidates in Group B and C are exhausted. In addition, the three examination lists comprising Group B shall expire as follows: the list established on February 4, 1970 shall expire 79 days from the date of this order; the list established on August 27, 1970 shall expire 9 months and 9 days from the date of this order; and the list established on March 26, 1971 shall expire 16 months and 8 days from the date of this order.

vii. Should a candidate qualify to be placed in Groups A, B or C after exhaustion of the Group for which he is eligible, said Group will be revived for purposes of affording the candidate the position he would have enjoyed.

viii. Upon the exhaustion of Groups A, B and C, candidates shall be certified from Group D. Provided, that the list of candidates comprising Group D shall expire 2 years and 6 months following the date of the last administration of the 1972 Interim Police Entrance Examination.

2. Should an appointing authority fail to offer an appointment to a candidate certified from Groups A, B, C or D, said defendants shall not authorize the requisitioning police department to make any appointment unless said police department has furnished said defendants with a written statement of its reason why said candidate was not offered an appointment.

## II. *Future Examinations*

3. Neither the 1972 Interim Police Entrance Examination nor any other such police entrance examination shall be administered in the future until such time as it has been validated in conformity with the Testing Guidelines of the Equal Employment Opportunity Commission, 29 CFR s. 1607.1 et seq. Provided, that veterans shall be given the opportunity to take "make-up examinations" in accordance with existing Massachusetts law.

## III. *Recruitment*

Three months prior to the administration of future police entrance examinations, an affirmative recruitment program shall be commenced in order to recruit black and Spanish-surnamed police applicants. Said recruitment program shall include public statements, advertising in the media of press, radio, and television, and direct contact with minority organizations.

## IV. *Reporting*

5. On a monthly basis following the entry of this order, counsel for the plaintiffs will be furnished with a status report concerning certifications and appointments. This report shall contain the following information:

a. for each requisitioning police department, a copy of the requisition and certification, and the name and address of each black and Spanish-surnamed candidate certified for appointment.

b. the action taken with respect to each such black and Spanish-surnamed candidate.

c. the number of white candidates certified for appointment.

d. the action taken with respect to such white candidates.

e. the name and address of each black and Spanish-surnamed candidate appointed subsequent to the date of this order whose employment is terminated, and the reason therefor.

f. for each police department the name and address of each candidate in Groups A and C.

6. One month after entry of this order, counsel for the plaintiffs will be furnished with a report containing the following information:

for each police department, the number and percentage of black and Spanish-surnamed police officers.

7. Six months after each future police entrance examination, counsel for the plaintiffs will be furnished with a report containing the following information:

the number and percentage of the white, black and Spanish-surnamed persons who apply for appointment and who are found eligible for appointment.

8. Four months prior to the administration of any future police entrance examination, counsel for the plaintiffs will be furnished with a detailed description of the affirmative program to recruit black and Spanish-surnamed applicants.

/s/ Charles E. Wyzanski, Jr.
Senior District Judge

/s/ John F. McGarry
Assistant Attorney General for the Civil Service Defendants

/s/ Richard A. Howard
Attorney for Intervenors

/s/ John F. Dargin, Jr.
Attorney for Intervenors

/s/ Nicholas Foundas
Attorney for Defendant Police Commissioner of City of Boston

/s/ Thomas A. Mela
Attorney for Plaintiffs

/s/ Patrick J. King
Attorney for Plaintiffs

### APPENDIX B

### OPINION OF MARCH 22, 1973

This case involves issues of great public importance. The safety of the com-

munity through the recruitment promptly and effectively of a reliable police force that will preserve and extend law and order is at stake. There is deeply involved fairness toward all groups in the Commonwealth. Included are those who are in minority, disadvantaged positions because of discrimination against persons of the black race and persons who come from the Spanish-speaking areas of the Caribbean. Also there are persons who in good faith took and passed examinations for police positions, but whose consideration for appointment has been long postponed. And there is the important interest of the state in maintaining high standards of civil service administration so that we shall not lose the long battle against the spoils system and against political jobbery. Not least is the need for a judiciary, which while sensitive to the overriding claims of social justice, keeps within boundaries which are suitable for courts, which must recognize that they are less the governors than the guardians of society.

The way the present controversy arises is understandable only against a wide background. Unless the setting is understood, there is a danger that minor technicalities will dominate decision. What is requisite is a large-minded approach, with a willingness of both this and other courts constantly to re-examine what has been done, and what may still properly be done to achieve the best solution which the judicial process permits.

When this case began, plaintiffs, as representatives of a class of black and Spanish-speaking persons, sought injunctive and declaratory relief against, among others, the members of the Massachusetts Civil Service Commission. Plaintiffs complained that defendants, by their civil service examinations, without having invidious intent, had violated the plaintiffs' rights under the Fourteenth Amendment to the United States Constitution and under the Civil Rights Act, 42 U.S.C. § 1983. Plaintiffs asserted rights to a non-discriminatory opportunity to be considered for positions as pa-

trolmen in the police forces of the cities and towns of the Commonwealth of Massachusetts and of certain state agencies. Specific objection was made to civil service examinations which were alleged to have been not job-related, and to have operated in a racially discriminatory fashion.

Both this court, 334 F.Supp. 930, and the Court of Appeals, 1 Cir., 459 F.2d 725, found as a fact and concluded as a matter of law, that this part of plaintiffs' complaint was well grounded, and that they were entitled to relief.

Plaintiffs made other objections to height tests, swimming tests, high school educational requirements, and methods of recruiting; but both this court and the Court of Appeals overruled those objections. They need not now detain us.

In the earlier stages of this litigation, this court took the position that plaintiffs were not entitled to limit their claim only to the wrongs alleged to have been suffered by blacks and Spanish-speaking persons. Originally this court said that whatever was wrong in the treatment plaintiffs suffered was also suffered by other disadvantaged persons such as yellows, browns, and whites from backward communities. But the Court of Appeals disagreed and concluded that plaintiffs had a right to have special consideration of the rights of the blacks and Spanish-speaking persons. They were the only ones for whom plaintiffs had chosen to speak. In this case that appellate ruling governs, and is not open for re-consideration now. Like the issues with respect to the height, swim, and high school tests, the matter is concluded by the doctrine of "the law of the case."

The same doctrine forecloses any further debate now about the general status of the police candidates who successfully passed the earlier civil service examinations. This is true even though those earlier examinations were found by both this court and the Court of Appeals to have the defect of not being job-related.

That is, we have a situation in which although both the trial court and the appellate court sustained plaintiffs in their claims that three of the civil service examinations were indeed discriminatory, and thus violative of plaintiffs' rights under the Fourteenth Amendment and 42 U.S.C. § 1983, and that the Civil Service Commission was under a duty to set new examinations, which remained subject to challenge on any contention that these new examinations were non-job-related or otherwise invidiously discriminatory, nonetheless this court should in prescribing any final relief find some formula affording a degree of priority or protection not only for those blacks and Spanish-speaking persons who succeeded in such new examinations, but also for those persons, whatever their color or native language, who had succeeded in the earlier invalid examinations.

The basic approach of the Court of Appeals appears to have been that it would be relatively manageable for the Civil Service Commission to move promptly and fairly to set, conduct, and certify the results of, such new examinations. The appellate court, in general, approved the mechanical aids toward that end which, at an earlier stage, this court had laid down. For example, this court had directed that the Commission should use a competent, experienced, and otherwise qualified person or agency to design the new examinations, that an independent person or agency should certify approval of the design, and that, after the examinations had been given, those who contended that the new examinations were not job-related or otherwise proper would have their day in court. Thereafter, the appellate court mandate contemplated that this court, if satisfied that the examinations were unobjectionable, would arrange the priorities among the successful black and Spanish-speaking examination-takers, the persons who had succeeded in previous examinations, and such others as had passed the new examinations. Probably, though not certainly, the appellate court expected this court also to take into account veterans' preferences or other Massachusetts statutory criteria.

The appellate court expressly stated, and this court in open session immediately after the appellate decision emphasized, that it was the duty of the Civil Service Commission to move with despatch. We recognized the pressing need of the cities, towns and state agencies for new permanently-appointed police patrolmen. We saw no excuse for delay, whether caused by inefficiency, inertia, or opposition to the Constitutional rights of blacks and Spanish-speaking persons.

It is transparent that no one except the judges has shared this concern for expedition.

Months have elapsed during which the Civil Service Commission and those it called upon to aid in preparing, giving, and grading examinations have dawdled.

No party or intervenor filed with this court until March 21, 1973, more than nine months after the opinion of the Court of Appeals, any motion for expedition or immediate relief.

Mindful of criticism directed at it for its past activism, this court did not feel that in this particular case it, without the wish of any party or intervenor, ought, in the manner characteristic of so many of this court's earlier procedures, to move on its own initiative. Too often the Court of Appeals has rebuked this court for proceeding too swiftly, independently, and originally.

But at last the intervening persons who successfully years ago passed civil service examinations have moved for relief.

The need for action is undeniable. The intervenors have a right to speedy justice. The people of Massachusetts have a right to have full complements of police. The blacks and Spanish-speaking persons have a right to be considered for jobs.

Yet it is plain not merely that the Civil Service Commission has been dilatory; it has also been insensitive to the

fundamental nature of this controversy and to the Constitutional imperative.

What is clearly shown by the record in this case, and established by the concurrent findings of this court and the Court of Appeals, is that although, for example, in the population of the Commonwealth of Massachusetts over ___ per cent are black, only ___ per cent of the successful candidates at the most recent examination conducted by the Civil Service Commission since the mandate of the Court of Appeals are black. It is a reasonable inference that the figures with respect to Spanish-speaking persons are not different.

It is, of course, not merely conceivable, but even likely, that blacks and Spanish-speaking persons are somewhat less interested than certain ethnic groups among the whites, in becoming policemen. This is a point which this court noted in its earlier opinions. It is also conceivable, and also likely, that no matter how sensitively examinations, verbal or nonverbal, intellectual or non-intellectual, were designed in order to be job-related, blacks and Spanish-speaking persons, as a whole, would not make quite so good a showing as the generality of white candidates of non-Spanish-speaking background. That is NOT because blacks or Spanish-speaking persons are, as some would have us believe, genetically inferior. It is in large part, and perhaps altogether, due to the way such persons have been prepared, or rather not prepared, by their early environment and culture. Being deprived persons to whom our society does not from their infancy give an equal opportunity, the generality of blacks and Spanish-speaking persons will not at maturity have the same chance as the generality of mainstream whites.

Yet, with all allowances that are appropriate for such handicaps, there is a *prima facie* presumption that on a job-related examination which is reasonably set to meet merely the requirements (and not something above the requirements) of a police patrolman's job, the percentage of successful black and Spanish-speaking persons who would choose .to be patrolmen and who also would meet the requirements of the job would nearly approximate the percentage of blacks and Spanish-speaking persons in the population of the Commonwealth.

The fact that in Massachusetts the blacks and Spanish-speaking have such a small number of police indicates that they have been selected by some method other than job-related examinations, or by examinations which, if job-related are unnecessarily set at standards higher than the job reasonably requires. This point is made even clearer if instead of referring to Commonwealth-wide figures we take as the basis of comparison the large cities like Boston, Springfield, Worcester, and Cambridge. In Boston, for instance, blacks are over 18% of the population and hardly 2% of the police force.

Supporting the view that there must be a vice in the general approach of the Massachusetts Civil Service Commission is the undeniable fact, more than hinted at in the record, that other communities in this nation do not have the difficulties which beset the Bay State authorities. The District of Columbia, Detroit, and the cities of California have well-known examples of police forces where the percentage of blacks approaches the percentage of blacks in the population. We do not pause to observe how far this appropriate ratio has produced improvement in law and order, betterment of race relations, and achievement of democratic ideals. Nor do we draw upon those examples to show that the job of police patrolman, unlike a post on the Atomic Energy Commission or the role of brain surgeon, is not of such refined complexity that there will be few suitable candidates from groups which have suffered from infancy deprivations of educational and environmental opportunity. It is highly probable that there is a vast reservoir of blacks and Spanish-speaking persons who are fit to be and willing to be policemen. That is what we are taught by the experience of doz-

ens of American cities which are Constitutionally alert and democratically governed.

The explanation for the Massachusetts situation is obvious. What the Massachusetts Civil Service Commission, despite the plain warning from this court and the Court of Appeals, persists in doing is over-emphasizing scholastic skills, paper and pencil capacities, and performance in tests which even when relevant are set higher than is requisite for satisfactory police performance. Indeed the record suggests that the tests are now being set at levels higher than could be passed by many wholly satisfactory policemen currently employed by Massachusetts cities and towns.

What is obviously needed is to set realistic standards keyed to actual police requirements and present (or reasonably to be expected) performance. To be a policeman one need not know Keats' "Ode to a Nightingale." No doubt appropriate tests should be part verbal. But appropriate tests would also seek, *and not necessarily by written examination,* to discover how effective a policeman is as an embodiment of authority, as a community worker charged with the mediating and counselling functions of a patrolman, as a mature individual restraining and simultaneously educating young or unstable members of the community, as a street official directing traffic, as a watchman guarding persons and property threatened with harm, as an investigator reporting incidents to superior officers, as a witness testifying in courts, and as a city representative doing the other characteristic tasks which while they may not make a policeman's lot a happy one, make it of indispensable importance in our civilization.

Years ago, Mr. Robert H. Jackson, then Assistant Attorney General of the United States, and only later a Justice of The Supreme Court of The United States, when faced with an obdurate tribunal, correctly and, as usual wittily, remarked that "you cannot amend a state of mind."

This court cannot amend the state of mind of the Massachusetts Civil Service Commission.

The only practical alternative, as a last resort, is for this court to act in this situation the way courts have acted with respect to obdurate local school boards which would not in the spirit and letter of the Constitution carry out the Constitutional command to give due process and equal protection to children who were on racial grounds denied educational opportunity. In those cases courts have appointed receivers. It is admittedly not a very desirable solution. But, after all, that is what federal courts have often done when other forms of administering justice under law have failed. That is how in the Nineteenth Century the railroads of this country were salvaged. That is how the schools have been made democratic. And that is what this court proposes to do with respect to the Massachusetts Civil Service-Massachusetts police situation. Enough, and more than enough, time has been allowed to the local authorities to set their houses in order. What lies ahead, if this court remains supine, are further delay and defeat of Constitutional guarantees of equal protection and due process.

In connection with his duties, the receiver will be directed (1) within two weeks after taking office to propose to this court a plan for a new kind of job-related examination, including nonverbal as well as verbal skills, and modeled on the successful experiences of other states and their municipalities and (2) within two months after the plan is approved by this court, to conduct an examination or examinations, to grade the examinations, and to certify to this court the standing of all the candidates. This court may or may not then direct the receiver to arrange the candidates in order, with due reference to the priorities adumbrated in the judgment of the Court of Appeals. This court will then consider whether, to accomplish the long and short-range goals indicated in the

opinion of the Court of Appeals it is necessary to set aside that procedure, now followed pursuant to Massachusetts law and practice, under which the number of persons certified to the city, town, or state agency appointing policemen is limited, and instead to certify a larger number with accompanying directions to the appointing agency to seek to establish not a quota but some reasonable relationship which simultaneously guarantees the rights of each candidate to a fair consideration of his merit as a policeman as shown by his examination record, and which takes into account the appointing agency's need for a police force so composed as to achieve the appropriate goals of the community for law and order, participation of all groups in the governance of society at the police level, and the fraternal accommodation of all persons to a regime which recognizes the responsibility and potentiality of each citizen in maintaining law and order.

No person shall be eliminated from consideration merely because he has a supposed deficiency or defect unless such deficiency or defect is shown to be significantly job-related. For example, if a candidate has a record of some minor nonviolent crime, that shall not constitute an automatic bar unless there is proof that commission of such crime is of job significance. It is not to be forgotten that wholly satisfactory members of Congress, of the Cabinet, and of the judiciary have not in every instance led spotless lives.

The court also reserves the right to consider whether, to achieve the goals described by the Court of Appeals, it may be appropriate to permit, despite any inhibiting local law or practice, a city, town, or state agency to take from the list of candidates certified to it, some or all of the certified persons for brief probationary periods, to test the candidate on the job, before tendering him a permanent appointment.

In view of the wholly reasonable question as to whether this court's present judgment is within the scope of the mandate from the Court of Appeals or is otherwise objectionable, the order now entered is stayed for two weeks to permit appeal. Until that time is exhausted, and until the Court of Appeals has had opportunity to consider any appeal that may be taken, this court will not name a receiver.

## APPENDIX C

## MEMORANDUM OF MARCH 28, 1973

The great problems here involved are the security of people and the opportunity for participation in government by all groups, in particular those who are now, through discriminatory practices, denied a share in law enforcement.

The federal courts have been drawn into this area by litigation which is really on the fringe of the problem. The blacks and Spanish-speaking who claimed that they were being denied equal opportunity to be employed as police were right. They were also right in claiming that one of the barriers was a civil service exam system in which the tests were not job-related. But what they have not perceived is that even if the tests were wholly job-related and in no way discriminatory, the result would not be that their disadvantaged groups would get in proportion to their numbers positions in police forces, either at the lowest level or through the police hierarchy.

What stands in the way of the disadvantaged blacks and Spanish-speaking is a merit system. Whenever people are chosen on the basis of objective criteria of merit the disadvantaged will always get a small proportion of the places. The situation is the same as in admission to colleges. If one wants to get a proportion of blacks roughly equal to their percentage in the community, one has to lower the barriers for blacks and raise barriers against others. One of the justifications for such proceedings now is that, in the long run, the community will be better off if there is a benign quota so blacks can make up for

their historical suffering at the hands of the white community. Moreover, benign quotas may help to promote a better society. It may be in the general interest that everyone share in the government whether or not he is best qualified in the ordinary ways of proficiency and personal efficiency. This is a terribly troublesome issue. The way one votes on it is probably a reflection of one's whole philosophy and probably one's age, one's ethnic background, and possibly even one's sex. Of course, women think they are equal to men, but because of cultural lags in society and training to which women previously have been exposed or not exposed, women en masse are not equal to men en masse for all types of jobs. Nor are blacks, nor are Spanish-speaking people. Yet maybe we cannot wait until equality and competence are achieved. Inasmuch as inequalities are due less to genetic than to cultural factors, perhaps society has to meet the revolutionary demand for equality by according it now, in spite of the differential consequent upon historical injustice.

Now the difficulty with all this pleasant theory is that it appeals chiefly to the young and disadvantaged. It is quite contrary to the outlook of those with selfish, vested interests, whether they be male or white, or even Irish police who traditionally have occupied the vocational opportunities of police and like civil service jobs.

Those who already are beneficiaries of the present situation have no wish to surrender their perquisites and privileges. They feel exactly like the guards at Walpole State Prison who have no intention of according civil rights to the prisoners which undermine the guards' hitherto relatively easy, socially inferior, and hardly pleasurable jobs. The police, like the prison guards, get paid in the autocratic coin. That is, their only reward is authority, not prestige in the outside world, nor cash in large sums. Don't expect them to give up their despotic rule without a fight.

Not only do those who directly benefit from the present lopsided system oppose reform, but also the whole of society's inertia is the greatest force against reform. It takes constant effort—intellectual, physical and moral—to carry through any reform. Who will really spend his days and nights in bringing about changes which seem to some to be so desirable? The Don Quixotes who bring litigation to set aside the discriminatory practice, after they win a glorious victory in the courts, will not do a thing to administer day-by-day and pain-by-pain the reform deemed appropriate. Judges who have written earth-shaking opinions, and even judges who with meticulous care on appeal modify decrees have no interest in spending 365 days a year in making their judgments workable. What looks like a great victory in the courts, unless it is day-by-day buttressed by action which follows through to make the judgments effective, will turn out to be something like the Reconstruction Acts of the post-Civil War in the United States.

All that any conservative needs to do is recognize that as time has been his friend in the past, so time will be his friend in the future. What every conservative knows is what Burke taught: that reform is impractical except as a gradual modification of complex social structures. This idea has been given immortal expression in *King Lear*: "Ripeness is all."

All these ruminations lead me to wonder what is being accomplished in *Castro v. Beecher*. I know that 2000 places are not being filled by permanent appointments to the police forces, and as a result we have less security than we are entitled to. I am aware that no one in the civil service is hurrying the process of setting up decent exams and reporting the results to the authorities. I have some doubt as to whether anybody has faced up to the question of what remedy would work except temporary suspension of civil service statutes. Just as universities suspend or modify

their admission policies when they want to get in a certain number of blacks, what court dares to admit that the Fourteenth Amendment as properly construed is no solution to this problem because you have to transcend the Amendment to give people not equal protection, but special protection.

Yet this very need for special protection is perhaps the key to the whole police problem if the police is to be a rainbow mirroring the various bands in our population. How will we ever get a real understanding of the problem? Yankees do not really realize the issues beyond their own complacent self-interest, nor do the Irish, nor do the Jews. Nor is anybody in any ethnic group fully aware of what motivates other ethnic groups. Some, like the Yankee Brahmins, are above the battle. At the top of the pyramid, they don't care about the fighting among lesser breeds for relative priority at low levels like the police. Those who are in the cellar do care. Consider Louise Day Hicks, or the Jewish home-owners in Forest Hills, New York.

Theodore Roosevelt, Woodrow Wilson and all the other assimilationists, including Israel Zangwill in his celebrated phrase, "the melting pot," were all almost 100% mistaken. One cannot operate a pluralistic society effectively on a Booker T. Washington model.

The objective of a decent American Commonwealth should not be to seek to imitate the Founding Fathers. They, of course, were almost 100% WASPS, or lofty Catholics not in the East Boston mould.

We should rather apply the Christian doctrine that "my father's house has many mansions" and also recognize that most people are not happy to live in mansions unless made, in Isaiah's terms, of "rock whence they were hewn."

Would it help solve the immediate dilemma facing the U. S. Court in the District of Massachusetts for the judge to set forth in very broad terms the damage being done by parochial litigation which tries to solve the problem within a Procrustean framework of judicial remedies?

Would the right course be for the judge, after making a declaration exposing the real issue, to appoint a commission of masters to give an *immediate* report on what would be a workable framework (including legislative changes), and not one narrowly confined by judicial precedents? Possibly the commission would even inform the court that its only effective way of achieving equal protection would be for the court itself to suspend the Massachusetts Civil Service Act's application to the police for a period of so many years!

If such a commission were created, could it start to break ground promptly and effectively, with some chance of public response by a tentative report within two months and a final report within four months?

No one could know better than I how foolish one can look when one sketches Utopia and then steps back to see what has *not* happened. About a year ago I wrote an article for *The Globe* on the police issue. I even talked with police about my willingness to appear face-to-face with local police, particularly in service along the lines of the article. Absolutely nothing of practical consequence followed.

I ought also to bear in mind how this suggested approach relates to my conduct in *Worcester*. There did I really lay the foundation for the Massachusetts Crime Commission or did I just undermine the community's general confidence in me as judge.

Before I act let me think a little more. One argument, however, which I must not yield to is that what I am tentatively proposing should not be done because it is dangerous. Nothing really worth doing is without high risk. Perhaps the worst of fates is to imitate the character of Hamlet.

Opinion May 7, 1973

Plaintiffs filed last week a motion to compel compliance with the consent de-

cree of April 15, 1973. The complaint relates to the alleged unfairness, irrelevance, and illegality of the physical fitness, emotional, and other tests given by the Civil Service Commission. Whatever may be said about the merits of the complaint, particularly in connection with women applicants, this court in this matter at this stage has only a limited jurisdiction. The sole power of this court now in this particular case is to consider whether there has been addressed to the court any allegation of violation by any defendant of any part of the April 15, 1973 decree. This court discerns no such allegation on the complaint. Hence the motion is denied, without prejudice to any complaint in a wholly independent proceeding in either federal or state court or both.

Motion denied.