Pedro CASTRO, et al., Plaintiffs,

v.

Nancy B. BEECHER, et al., Defendants.

BOSTON CHAPTER, NAACP, et al., Plaintiffs,

v.

Nancy B. BEECHER, et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

CITY OF BOSTON, et al., Defendants.

Civ. A. Nos. 70–1220–C, 74–2982–C, 72–3060–C and 73–269–C.

United States District Court, D. Massachusetts.

Aug. 7, 1981.

Peggy A. Wiesenberg, Judith S. Bernstein, Lawyer's Committee for Civil Rights Under Law of the Boston Bar Ass'n, Margaret Hinkle, James S. Dittmar, Berman, Dittmar & Engle, Boston, Mass., for plaintiffs.

Terry F. Lenzner, Jonathan A. Schiller, Warren N. Eggleston, Rogovin, Stern, Huge & Lenzner, Washington, D. C., for City of Boston, defendant.

Harold J. Carroll, Corp. Counsel, Nick Fondar, Boston, Mass., for Police Commissioner of Boston.

Frank J. McGee, Marshfield, Mass., for intervenor Boston Police Patrolmen's Assn.

Betty E. Waxman, Alan Posner, Asst. Attys. Gen., Boston, Mass., for State defendants.

## OPINION

CAFFREY, Chief Judge.

These four cases, all of which have long since gone to judgment, are before the Court on motions filed by the plaintiffs in each case to modify prior remedial orders. All four cases raise substantially the same legal issue, i. e. may the City of Boston in conducting reductions in force in the Boston Police and Fire Departments decide which police officers and which firemen to terminate on the basis of seniority as directed by M.G.L. c. 31 § 39, or must the City of Boston maintain the percentage of minority representation existing as of July 6, 1981 by persons who are either black or hispanic.

The past history of this litigation may be summarized as follows: The police case was begun and assigned to the Honorable Charles E. Wyzanski, Jr., who tried the case and entered a judgment, after which an appeal was taken to the First Circuit and the Court of Appeals filed an opinion giving directions for further proceedings by Judge Wyzanski. Judge Wyzanski made additional rulings and then subsequent litigation in the police case was assigned to and handled by the undersigned, including the monitoring of remedial measures. (For further background information see the undersigned's opinion of January 7, 1975 reported in 386 F.Supp. 1281.)

For present purposes suffice it to say that this action was commenced in 1970 by unsuccessful black and hispanic candidates for appointment as Boston Police officers. Plaintiffs claimed racial discrimination in the recruitment and certification practices initiated by the Massachusetts Civil Service Commission and implemented, through appointment procedures by the police forces of the City of Boston, other cities and towns, and other appointing authorities subject to Massachusetts Civil Service regulations. Following trial, Judge Wyzanski made extensive findings, including findings that, in 1960, blacks represented 9 percent of the population of Boston and but 2 percent of its police force and, in 1970, 16.3 percent of the population and but 3.6 percent of the police force. Judge Wyzanski also found that the Massachusetts Civil Service Police Entrance Examination discriminated against minorities who did not share mainstream white culture. Judge Wyzanski held that plaintiffs had been discriminated against. 334 F.Supp. 930 (1971).

Appeal followed to the First Circuit. The Court of Appeals held that the civil service examinations were racially discriminatory. The Court of Appeals remanded the case with instructions that the district court enter a remedial order providing for implementation of a substantially job-related examination and providing for certification of

black and hispanic applicants on a priority basis to be determined, under guidelines recommended by the Court of Appeals, by the District Court. The Court of Appeals insisted that relief "is to be more than token." 459 F.2d 725, 737 (5th Cir. 1972).

On remand Judge Wyzanski approved and entered a comprehensive consent decree, finding that it was "just, reasonable and in the public interest, and more likely than any other proposed solution to give the people of the Commonwealth of Massachusetts effective non-discriminatory, dedicated, and honorable police forces . . . ." 365 F.Supp. 655, 660 (1973). The remedial order provided, among other measures, for the establishment of civil service certification priority pools consisting of certain black and Spanish-surnamed applicants, and for the implementation of affirmative recruitment programs for the purpose of recruiting black and Spanish-surnamed police applicants. *Id.* at 660–662 (1973). Immediately prior to approval of the consent decree, Judge Wyzanski had issued an opinion exhorting the parties to reach agreement on the provisions of the decree, in the course of which he observed:

> there is a *prima facie* presumption that on a job-related examination which is reasonably set to meet merely the requirements (and not something above the requirements) of a police patrolman's job, the percentage of successful black and Spanish-speaking persons who would choose to be patrolmen and who also would meet the requirements of the job would nearly approximate the percentage of blacks and Spanish-speaking persons in the population of the Commonwealth. *Id.* at 655.

In 1975 plaintiffs brought an action pursuant to the All Writs Act for the purpose of clarifying and preserving the effect of the prior consent decree in light of proceedings which had taken place in the Massachusetts Superior and Supreme Judicial Courts upon applications by certain Massachusetts cities and towns to establish the right to appoint police officers in accordance with certain statutory preferences.

The action was assigned to the undersigned, who subsequently has supervised all aspects of the two consolidated police cases, including holding that statutory preferences were not displaced by the prior consent decree except to the extent that the preferences must be applied within the several groups established by the priority appointment procedures contained in the consent decree. I also further requested the parties to arrive at a substitute consent decree and recommended the remedy adopted in *NAACP v. Beecher,* 371 F.Supp. 507 (D.Mass.), aff'd, 504 F.2d 1017 (1st Cir. 1975). 386 F.Supp. 1281 (1975).

Thereafter, all parties entered into a consent decree, approved and entered by the Court on July 7, 1975. This consent decree provides, among other measures, for the establishment of priority certification groups for police applicants, for an affirmative recruitment program for black and hispanic applicants and for procedures for administration and reporting with respect to police entrance examinations. This decree required certification of police applicants by methods in essence designed to facilitate the appointment by Boston and Springfield of one minority policeman for each white policeman, and to facilitate the appointment by other appointing authorities on a ratio of one to three. The decree also provided that the method and ratios of certification provided for by the decree shall apply to all cities and towns which have a minority population of one percent or more until any such city or town "achieves a complement of minorities commensurate with the percentage of minorities within the community," at which point further certification will be made in accordance with existing Massachusetts law. This parity target had been established by the Court in the *NAACP v. Beecher* decree to which I previously directed the parties.

On July 13, 1976, the writer approved and entered a supplemental consent decree. This decree contained further administrative procedures for monitoring the continuing implementation of prior decrees. This decree also exempted from further applica-

tion of the method and ratios of certification contained in the July 7, 1975 consent decree the police departments of 81 cities and towns which had attained parity of the percentage of blacks and hispanics in police service with the percentage of blacks and hispanics in municipal population according to then current census statistics. Ninety one cities and towns plus the MBTA, MDC and Capitol Police forces remain subject to the decree.

On June 1, 1979 I further approved and entered an agreement as to the May, 1978 examination which provided, among other measures, for the continuing applicability of the method and ratios for certification provided for by the 1975 consent decree and for further recruitment activities and monitoring of the civil service examination.

As found in prior proceedings, in 1970 the Boston Police Department employed 2805 officers. Sixty-five of these were black or Spanish-surnamed, representing 2.3 percent. 459 F.2d at 728, 730. At the same time, the population of the city was 16.3 percent black. *Id.* at 728.

Since 1973, as a result of implementation of this Court's orders, Boston has increased the representation of minorities in the Police Department from 2.3 percent to 11.7 percent. Pursuant to the methods, ratios and procedures provided for by prior decrees, the Boston Police Department has hired, between 1974 and the present, 451 police officers, of whom 243 (53.88 percent) have been white and 208 (46 percent) have been Black, Spanish-surnamed and other minorities. However, the minority population of Boston has increased during the intervening decade to 30 percent. The percentage of black and hispanic officers in the Police Department, therefore, remains far below the percentage of minorities in the city and the parity level which the Court's prior remedial orders were designed to achieve.

Against this background, the City of Boston presently plans, and has begun to implement, massive reductions in work force in the Boston police and fire departments for alleged reasons of fiscal austerity.

I find on the basis of stipulations entered into by the parties on July 29, 1981, that reductions in force now being conducted, and scheduled for completion on August 18, 1981, would reduce minority representation in the police force to 6.2%, contrasted with the 11.7% as of July 6, 1981. Similar reductions in the Fire Department, to be completed on August 12, 1981, would leave a 9.1% minority representation, as compared with the 14.7% level of July 6, 1981.

The litigation involving the members of the Fire Department has followed a substantially similar course down through the years and is described with far greater specificity than is necessary for present purposes in an opinion filed by Judge Freedman on February 8, 1974, reported in 371 F.Supp. 507 (1974). The firemen's cases were later transferred from Judge Freedman to the Honorable John J. McNaught, in whose temporary absence the firemen's cases are also being handled by the undersigned.

Given the foregoing, it should be noted that contrary to specious arguments for counsel for the state respondents, this motion does not constitute the filing of a new complaint, does not warrant respondents filing an answer, and does not require a new trial. Stating the matter affirmatively, this motion is a request that this Court modify a remedial decree which it has been monitoring for many years. The Court clearly has power to do so on the basis of both Rule 60(b)(6) of the Federal Rules of Civil Procedure and under its inherent equitable power. It was so ruled by the Supreme Court of the United States in *United States v. Swift*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932) where (286 U.S. at page 115, 52 S.Ct. at 462) the Supreme Court stated:

A Court does not abdicate its power to revoke or modify its mandate if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong.

The standard to be followed by a district court in deciding whether and when to exercise its inherent right to modify a remedi-

al decree was also stated by the Supreme Court in *United States v. Swift* (at page 119, 52 S.Ct. at 464) where the Court told us:

Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation.

I rule on the basis of the entire record of these cases from 1970 to date:

1. that the orders previously entered in all of these cases were decreed after years of litigation;

2. that the massive firings claimed by municipal authorities to be a result of the voters enacting Proposition 2½ amount to "new and unforeseen conditions" within the *Swift* ruling; and

3. that if this Court fails to modify the decree, as requested by plaintiffs' motions, then a grievous wrong would be produced by this Court's non-action, i. e. a refusal to amend the remedial order would allow the substantial eradication of all progress made by blacks and hispanics in securing public employment as members of either the police or fire departments since 1970.

4. that it is obvious from the opinion of the United States Court of Appeals for the First Circuit that using M.G.L. c. 31 § 39 to *de facto* reverse all of the results granted over the past 11 years would not be tolerated by that Court. Cf. *Brown v. Neeb*, C.A. No. 72–282, July 3, 1980 (N.D.Ohio); *aff'd* 644 F.2d 551 (6th Cir.).

It should be noted in view of the argument by various respondents that the earlier remedial decrees do not talk about terminations, that the argument first of all is factually fallacious in that both Judge Wyzanski and this writer have made reference to terminations, see Section IV, para. 5(e), Consent Decree by Wyzanski, J., 365 F.Supp. 655, 662 (1973), and para. 19(b), Consent Decree by Caffrey, Ch. J., unreported, July 7, 1975. Secondly, and more importantly, it is beyond argument that, given the nature of the remedial decrees directed by the Court of Appeals, and given the objective thereof, namely bringing minority representation up to a level approximating the percentage of the total population which the minorities represent in the community, that if anything similar to Proposition 2½ had been in effect at the time that the remedial decrees were originally entered, these decrees would have been fashioned to make allowances for terminations so that the minority representation on both departments could have been maintained if not increased notwithstanding the then hypothetically ongoing terminations.

Accordingly, I rule that an order should enter granting plaintiffs' motions to modify prior remedial orders and enjoining respondents from reducing the percentage of black and hispanic police officers on the City of Boston police force below the 11.7% of July 6, 1981, and enjoining the City of Boston from reducing the number of black and hispanic members of the Fire department below the 14.7% of July 6, 1981.

## ORDER

This matter having come on for hearing on plaintiffs' motion to modify prior remedial orders; and the Court having considered the prior proceedings had herein, further evidence regarding proposed reductions in force affecting the Fire Department of the City of Boston, the parties' briefs and the arguments of counsel; and the Court having found that a material change in circumstances—namely, the effective and proposed reductions in force—would nullify the Court's prior remedial orders and frustrate the intent of those orders; and the Court having found that modification of those prior remedial orders through entry of the within order is necessary to prevent that consequence, it is therefore,

ORDERED, ADJUDGED AND DECREED as follows:

1. The defendant Fire Commissioner of the City of Boston is hereby restrained and enjoined from reducing, pursuant to any departmental or city program of reductions in force of firefighters on account of lack of

funds or abolition of position, the percentage of minority firefighters in the City of Boston Fire Department below the level of 14.7 percent of all firefighters.

2. For the purpose of implementing this order, the defendant Fire Commissioner of the City of Boston shall establish and maintain separate seniority lists of firefighters, one for minority firefighters and one for non-minority firefighters and shall use such separate lists in implementing any program of reductions in force on account of lack of funds or abolition of positions. Within each separate seniority list, the seniority of each firefighter shall be computed pursuant to statute, M.G.L. c. 31 § 33.

3. As firefighters in the Boston Fire Department are separated from their positions because of lack of funds or abolition of positions, the defendant Fire Commissioner may terminate firefighters according to strict seniority until the reduction in force results in a reduction of the percentage of minority firefighters below 14.7 percent. At that point, the Commissioner shall utilize separate seniority lists for minority and non-minority firefighters and shall terminate the least senior firefighters from each of the two lists according to a mathematical ratio so that the percentage of minority firefighters at no time falls below 14.7 percent. Nothing herein shall disturb application of Massachusetts statutory preferences; provided that such preferences are applied solely within the separate seniority lists.

4. In the event that a firefighter's appeal of his termination to the defendant members of the Massachusetts Civil Service Commission challenges the method of termination set forth herein, the defendant members of the Civil Service Commission are hereby restrained and enjoined from disapproving, invalidating or interfering with the termination on that basis.

5. For the purpose of continuing the implementation of this Court's prior orders, the defendant Personnel Administrator is ordered to place the names of all City of Boston firefighters who are laid off for lack of funds or abolition of position on the Civil Service re-employment and reinstatement lists in the order in which they are laid off. Reinstatement and re-employment of firefighters on such lists shall be accomplished by the Personnel Administrator and by the Fire Commissioner in reverse order of such layoffs and in a manner so that the percentage of minority firefighters does not fall below 14.7 percent. The Personnel Administrator, upon receipt of any requisition for hiring, shall certify names from such lists prior to certifying names from any other list.

6. The parties are instructed to confer and negotiate with respect to any further practices and procedures necessary and appropriate for the implementation of the provisions of this order.

This matter having come on for hearing on plaintiffs' motion to modify prior remedial orders; and the Court having considered the prior proceedings had herein, further evidence regarding proposed reductions in force affecting the Police Department of the City of Boston, the parties' briefs and the arguments of counsel; and the Court having found that a material change in circumstances—namely, the effective and proposed reductions in force—would nullify the Court's prior remedial orders and frustrate the intent of those orders; and the Court having found that modification of those prior remedial orders through entry of the within order is necessary to prevent that consequence, it is therefore,

ORDERED, ADJUDGED AND DECREED as follows:

1. The defendant Commissioner of Police of the City of Boston is hereby restrained and enjoined from reducing, pursuant to any departmental or city program of reductions in force of police personnel on account of lack of funds or abolition of position, the percentage of black and Spanish-surnamed post-probationary police officers in the City of Boston Police Department below the level of 11.7 percent of all such officers.

2. For the purpose of implementing this order, the defendant Commissioner of Police of the City of Boston shall establish and maintain separate seniority lists of post-probationary police officers, one for minority officers and one for non-minority officers and shall use such separate lists in implementing any program of reductions in force on account of lack of funds or abolition of positions. Within each separate seniority list, the seniority of each officer shall be computed pursuant to statute, M.G.L. c. 31 § 33.

3. As police officers in the Boston Police Department are separated from their positions because of lack of funds or abolition of positions, the defendant Police Commissioner may terminate officers according to strict seniority until the reduction in force results in a reduction of the percentage of black and Spanish-surnamed police officers below 11.7 percent. At that point, the Commissioner shall utilize separate seniority lists for minority and non-minority police officers and shall terminate the least senior police officers from each of the two lists according to a mathematical ratio so that the percentage of black and Spanish-surnamed officers at no time falls below 11.7 percent. Nothing herein shall disturb application of Massachusetts statutory preferences; provided that such preferences are applied solely within the separate seniority lists.

4. In the event that a police officer's appeal of his termination to the defendant members of the Massachusetts Civil Service Commission challenges the method of termination set forth herein, the defendant members of the Civil Service Commission are hereby restrained and enjoined from disapproving, invalidating or interfering with the termination on that basis.

5. For the purpose of continuing the implementation of this Court's prior orders, the defendant Personnel Administrator is ordered to place the names of all City of Boston police who are laid off for lack of funds or abolition of position on the Civil Service re-employment and reinstatement lists in the order in which they are laid off.

Reinstatement and re-employment of police officers on such lists shall be accomplished by the Personnel Administrator and by the Commissioner of Police in reverse order of such layoffs and in a manner so that the percentage of black and Spanish-surnamed officers does not fall below 11.7 percent. The Personnel Administrator, upon receipt of any requisition for hiring, shall certify names from such lists prior to certifying names from any other list.

6. The parties are instructed to confer and negotiate with respect to any further practices and procedures necessary and appropriate for the implementation of the provisions of this order.