BOSTON CHAPTER, NAACP, et al.,
Plaintiffs-Appellees,

v.

Nancy B. BEECHER, et al.,
Defendants-Appellants,

and

Boston Firefighters Union, Local 718,
Intervenor-Appellant.

Pedro CASTRO, et al.,
Plaintiffs-Appellees,

v.

Nancy BEECHER, et al.,
Defendants-Appellants,

and

Boston Police Patrolmen's Association,
Inc., Intervenor-Appellant.

Nos. 81–1642, 81–1656, 81–1650
and 81–1651.

United States Court of Appeals,
First Circuit.

Argued Jan. 4, 1982.
Decided May 11, 1982.

E. David Wanger, Boston, Mass., with whom John F. McMahon, and Angoff, Goldman, Manning, Pyle & Wanger, P. C., Boston, Mass., were on brief, for intervenor, appellant Local 718 in Case No. 81–1642.

Frank J. McGee, Marshfield, Mass., on brief for intervenor-appellant Boston Police Patrolmen's Association, Inc.

Thomas A. Barnico, Asst. Atty. Gen., Government Bureau, Dept. of the Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for the State defendants-appellants in Case No. 81–1651.

Marc S. Seigle, Sp. Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for the State defendants-appellants in Case No. 81–1656.

James S. Dittmar, Boston, Mass., with whom Berman, Dittmar & Engel, P. C., Judith Bernstein Tracy, and Peggy A. Wiesenberg, Boston, Mass., were on brief, for plaintiffs-appellees.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

This case arises from a conflict between a statutorily established seniority system mandating layoffs on a last hired, first fired basis and court orders insulating a percentage of minorities from such system. Shortly after the July 1981 beginning of fiscal 1982, the Police and Fire Department of the City of Boston embarked upon a program of massive reductions in force, allegedly precipitated by budgetary restrictions imposed by "Proposition 2½." During the six-year period prior to the commencement of the layoffs, both departments had been steadily increasing the percentage of their black and hispanic members pursuant to consent decrees designed to remedy the present and continuing effects of past racial discrimination. The consent decrees were silent as to layoffs. If this reduction in force were conducted according to strict seniority as prescribed by Massachusetts law,[1] roughly half of the blacks and hispanics hired would be laid off. To prevent this substantial undoing of the progress made in integrating blacks and hispanics into the police and fire departments, the district court granted plaintiffs' motions in these four consolidated cases to modify the prior consent decrees by prohibiting both departments from reducing the percentage of blacks and hispanics in their respective work forces below the level obtaining at the commencement of the force-reduction program. Defendant Massachusetts Civil Service Commission (the Commission) and intervenors Boston Firefighters Union, Local 718, and Boston Police Patrolmen's Association, Inc., have appealed.

There are three fundamental issues: did the district court have the power to modify the consent decrees and, if so, did its orders impermissibly supersede a valid Massachusetts civil service statute or unconstitutionally impose reverse discrimination.

In order to understand the issues and to analyze properly the district court's modification of the consent decrees, it is necessary to begin by tracing the prior proceedings.[2]

---

1. Mass.Gen.Laws Ann. ch. 31, § 5.

2. We refer throughout this opinion to *Castro et al. v. Beecher et al.*, and related proceedings as the "police case." The police case is reported at 334 F.Supp. 930 (D.Mass.1971); 459 F.2d 725 (1st Cir. 1972); 365 F.Supp. 655 (D.Mass. 1973); 386 F.Supp. 1281 (D.Mass.1975). Similarly, we refer to *Boston Chapter, NAACP, Inc., et al. v. Beecher, et al.*, and related proceedings as the "fire case." The fire case is reported at 371 F.Supp. 507 (D.Mass.1974); 504 F.2d 1017 (1st Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); 423 F.Supp.

*The Police Case*

Plaintiffs, unsuccessful black and hispanic candidates for appointment as Boston police officers, commenced the police action in 1970. They claimed racial discrimination in violation of 42 U.S.C. §§ 1981 and 1983 in connection with the recruitment and certification practices established by the Massachusetts Civil Service Commission and implemented, through appointment procedures, by the Boston Police Department as well as other appointing authorities,[3] including other Massachusetts cities and towns and various state agencies. *Castro et al. v. Beecher et al.*, 334 F.Supp. 930, 934 (D.Mass.1971) (Wyzanski, J.).

Following trial, the district court made extensive findings, including findings that in 1970, blacks represented 16.3 percent of the population of Boston but only 3.6 percent of its police force. The district court also found that the 1968–1970 Massachusetts Civil Service Police Entrance Examinations were not job related and discriminated against minorities, including plaintiffs, who did not share "prevailing white culture." *Id.* at 943. It enjoined the Commission from issuing further certifications based on these examinations.

We held on appeal that the examinations were racially discriminatory, and remanded the case with instructions that the district court enter a remedial order requiring a nondiscriminatory, job-related examination and providing for certification of black and hispanic applicants on a priority basis, to be determined in accordance with guidelines that we set forth. *Castro et al. v. Beecher et al.*, 459 F.2d 725, 730–31, 737–38 (1st Cir. 1972). We noted that the prescribed remedy "will yield a significant increment of black and Spanish-surnamed police officers in the near term" and insisted that relief

fashioned by the district court "is to be more than token." *Id.* at 737.

On remand, after observing that unlike most consent decrees, this one had been preceded by full hearings, findings of fact, conclusions of law and several opinions both of the district and appellate courts, the district court approved a comprehensive consent decree, finding that it was "just, reasonable, and in the public interest, and more likely than any other proposed solution to give the people of the Commonwealth of Massachusetts effective, non-discriminatory, dedicated, and honorable police forces . . . ." 365 F.Supp. 655, 660 (D.Mass. 1973). The decree provided, among other measures, for the creation of civil service certification priority pools, consisting of black and hispanic applicants, and for the implementation of affirmative recruitments programs aimed at this group. *Id.* at 660–62.

In 1975 plaintiffs instituted another action under the All Writs Act, 28 U.S.C. § 1651, seeking to clarify and preserve the effect of the district court's decree in light of litigation that had taken place in Massachusetts courts relating to the rights of cities and towns to grant statutory preferences to residents and veterans in appointing police officers. The court (Caffrey, C. J.) held that the prior decree did not displace these statutory preferences except insofar as the preferences must be applied within the several groups of applicants established by the decree. 386 F.Supp. 1281, 1285 (D.Mass.1975). It urged that the parties agree upon a substitute consent decree and recommended they follow the one adopted in the fire case, *Boston Chapter, NAACP, Inc. v. Beecher et al.*, 371 F.Supp. 507 (D.Mass.1974), *aff'd*, 504 F.2d 1017 (1st Cir.), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). *Id.* at 1286.[4]

696 (D.Mass.1976). Both the police and fire cases were reported most recently in Chief Judge Caffrey's consolidated opinion, 522 F.Supp. 873 (D.Mass.1981), from which this appeal arises.

3. Among the named defendants were the Metropolitan District Commission, the Massachu-

setts Bay Transportation Authority, and the Capitol Police. 334 F.Supp. at 934.

4. The consent decree finally agreed upon in the police case directed that four groups of eligible police officer candidates be established for each requisitioning police department:

Group A consisted of minority applicants who failed discriminatory police entrance ex-

Thereafter the parties entered into a further consent decree, which the district court approved on July 7, 1975. This decree mandated, among other things, certification of police applicants by methods essentially designed to facilitate the appointment in Boston and Springfield of one minority police officer for each white officer, and to expedite minority appointments by other appointing authorities on a ratio of one to three. The decree provided that these remedial measures should apply to any city or town with a minority population of one percent or more until the police force of the municipality "achieves a complement of minorities commensurate with the percentage of minorities within the community," at which time further certification would be made according to existing Massachusetts law.[5] The same parity target had already been set in the fire case.

On July 13, 1976, and on June 1, 1979, the district court approved and entered supplemental consent decrees that provided, among other measures, for continuation of the consent decree's method and ratios for certification, for further affirmative recruitment activities, and for monitoring of the civil service examination. They also discharged from further judicial supervision the police departments of cities and towns that had attained the parity target according to then current census statistics.

In the spring of 1981, the Boston Police Department initiated the reduction in force program. Thereafter, on April 6, 1981, plaintiffs filed a motion pursuant to Federal Rule Civil Procedure 60(b) to modify prior remedial orders. Following state funding legislation that led to a rescinding of the layoff program for fiscal 1981, plaintiffs requested that the court continue their motion until the program was reinstituted. In the first week of July 1981 the police department reactivated the layoff program, and on July 30, 1981, the district court (Caffrey, C. J.) heard plaintiffs' motion together with a similar motion in the fire case. On August 7, 1981, the opinion and order issued enjoining the Boston Police Department and Fire Department from reducing the percentage of minority officers below the level existing at the commencement of the layoff program.

*The Fire Case*

Unsuccessful black and hispanic applicants for appointment as City of Boston fire fighters and the Boston Chapter of the NAACP commenced the fire case in 1972. As in the police case, the plaintiffs claimed racial discrimination in violation of 42 U.S.C. §§ 1981 and 1983 in connection with recruitment and certification practices established by the Massachusetts Civil Service Commission and implemented, through appointing procedures, by the Boston Fire Department as well as by other appointing authorities.

In 1973 the Attorney General of the United States brought an action raising similar claims, together with Title VII claims, 42 U.S.C. § 2000e *et seq.*, and the two actions were consolidated.

Following hearings, the district court made extensive findings, including findings that blacks represented approximately 16 percent of Boston's population, that the combined minority population was 23 percent of the total, and that blacks and hispanics represented only 0.9 percent of the fire department's sworn personnel. *Boston Chapter, NAACP, Inc. v. Beecher et al.*, 371 F.Supp. at 514 (Freedman, J.). The court

ams administered between 1968–1970 but who passed the 1972 interim exam and were otherwise qualified;
Group B consisted of persons on three eligibility lists established in 1970–1971;
Group C consisted of minority candidates not in Group A who passed the 1972 interim examination and were otherwise qualified;
Group D consisted of all other persons who passed the 1972 interim exam and were otherwise qualified.

The consent decree in the fire case contained essentially identical groups of candidates, except it stated that the discriminatory exams targeted by the priority pools were administered from August 1968 to August 1971.

5. This parity target also applied to the state agencies enumerated in note 3 *supra*, relative to the percentage of minorities in the communities served by those agencies.

treated the hearings on plaintiffs' challenge to the fire fighters' entrance examination as a trial on the merits pursuant to Federal Rule Civil Procedure 65(a)(2) and found that plaintiffs had established an unrebutted case of racial discrimination. The court found, as evidenced by the "insignificant" number of blacks and hispanics certified, that the examinations administered from 1968 through August 1971 were discriminatory. It also found that the word-of-mouth recruitment policy resulted in racial discrimination, albeit unintentional. *Id.* at 510, 517 & 519–20.[6]

To afford "affirmative relief to remedy the present effects of past discrimination," the district court ordered a program of active recruitment of minority fire fighters, enjoined further certification based upon the results of the discriminatory examinations, ordered development of a job-related examination, and required establishment of priority certification groups for black and hispanic applicants. *Id.* at 520–23. It ordered that the remedial measures mandated by its decree remain in force for any city or town with a minority population greater than one per cent until the fire department of the municipality "achieves a complement of minorities commensurate with the percentage of minorities within the community" at which time "certifications will be made according to existing Massachusetts law." *Id.* at 523.

We affirmed, holding that plaintiffs had demonstrated that the Massachusetts civil service test had a disproportionate impact on minority hiring and that defendants had not demonstrated job relatedness. *Boston Chapter, NAACP, Inc. v. Beecher et al.*, 504 F.2d 1017 (1st Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). *See also Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Regarding the subject of an appropriate remedy, we noted that in the police case we had required the district court to institute remedial measures "as a means of ameliorating the continuing effects of past discrimination . . . ." *Id.* at 1026. We approved the district court's decree, including the provision that the decree would remain in effect until any particular fire department attains "sufficient minority fire fighters to have a percentage on the force approximately equal to the percentage of minorities in the locality." *Id.* at 1027. We reasoned that the district court's color-conscious relief did not violate the Constitution because it "goes no further than to eliminate the lingering effects of previous practices that bore more heavily than was warranted on minorities," *id.*, and that "our society [is] well served by taking into account color in the fashion used and carefully limited in extent and duration . . . ." *Id.* We also rejected defendants' contention that the relief was barred by section 703(j)[7] of Title VII, 42 U.S.C. § 2000e–2(j). *Id.* at 1027–28.

Since the 1974 decree, the district court has entered several interim consent decrees

---

**6.** The district court concluded that defendants had not rebutted plaintiffs' prima facie case of discrimination established by the statistical disparity between the percentage of minority fire fighters in various fire departments and the relevant local population; it found that the entrance exams were not job related. *Boston Chapter, NAACP, Inc. v. Beecher et al.*, 371 F.Supp. 507, 517 (D.Mass.1974), citing *Castro et al. v. Beecher et al.*, 459 F.2d 725, 732 (1st Cir. 1972).

**7.** Section 703(j) of Title VII provides:

Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

42 U.S.C. § 2000e–2(j).

and stipulations to effectuate its original order. These subsequent orders have set procedures for administration of new examinations, establishment of eligibility lists, affirmative recruitment, and notice and reporting.

On April 7, 1981, upon commencement by the City of Boston of its force-reduction program, plaintiffs filed a motion to modify prior remedial orders. As in the police case, proceedings were continued until the consolidated hearing on July 30, 1981. The injunction covering both departments issued on August 7.

*The Facts*

The statistics are undisputed. At the time of the original filing of these actions, racial discrimination had led to the virtual exclusion of blacks and hispanics from Boston's Police and Fire Departments. In 1970, only 65 of 2,805 police officers were black or hispanic, representing but 2.3 percent of the total. 459 F.2d at 728 n.1, 730. As of 1974, only 18 of 1,983 fire fighters were black or hispanic, representing only 0.9 percent of the total. 371 F.Supp. at 514. In contrast, the minority population of Boston was more than 16 percent in 1970, 459 F.2d at 728, and approximately 23 percent by 1974. 504 F.2d at 1020 n.4.

The district court's remedial orders in both cases have produced marked progress eliminating the present and continuing effects of past discrimination. Between 1974 and 1980, the Boston Police Department hired 492 officers, of whom 213 (43 percent) were black or hispanic. As of July 6, 1981, 224 out of a total of 1,912 officers were black or hispanic; minority representation had risen to 11.7 percent. Between 1974 and 1980, the Boston Fire Department hired 553 fire fighters, of whom 248 (45 percent) were black or hispanic. On July 6, 1981, 248 out of a total of 1,690 fire fighters were black or hispanic; minority representation had increased in this department to 14.7 percent.

By 1980, however, the black and hispanic population of Boston had risen to between 29 and 30 percent, almost double the percentage of ten years prior.

Early in July 1981 both the Police and Fire Departments of the City of Boston commenced a systematic program of reduction in force. The city's program proposed six weekly layoffs, running from early July to mid-August. The police and fire departments planned to make these layoffs pursuant to the Massachusetts civil service statute, which requires separations from service in reverse order of seniority. Mass.Gen. Laws Ann. ch. 31, § 39.

Such a layoff program was certain to cause a devastating reduction in the number of black and hispanic officers on both forces. The police department planned to lay off 252 officers, of whom 122 were black or hispanic. Of the officers to be laid off, 48 percent were minority,[8] which comprised 54.5 percent of the department's entire complement of minority officers. The fire department planned to lay off 207 officers, of whom 113 (54.6 percent) were black or hispanic; this constituted 45.6 percent of all minorities on the force. Unbridled operation of the force-reduction program would have dramatically cut minority representation in both the police and fire departments. By mid-August 1981 only 103 of 1,660 police officers would have been black or hispanic, and minority representation would have fallen from 11.7 percent to 6.2 percent. By mid-August only 135 of 1,483 fire fighters would have been black or hispanic, and minority representation in that department would have dropped from 14.7 percent to 9.1 percent.

Moreover, although as of July 30, 1981, city officials intended to proceed with only

---

8. The Supreme Court has approved of racial preferences granted to "minority" groups of divergent composition. *Compare United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (blacks only) *with Fullilove, et al. v. Klutznick, Sec. of Commerce, et al.*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts). Throughout this opinion, our references to "minority" group members pertain to blacks and hispanics only. Whether a particular individual qualifies as a "minority" group member entitled to relief according to this definition has not been raised by the parties and we proffer no opinion on that question.

six waves of layoffs, there was no certainty that further force reductions would not occur.

*The Decision Below*

In its August 7, 1981 consolidated opinion, the district court made the specific findings outlined above. It then found, on the basis of the entire record in both cases, that "the massive firings claimed by municipal authorities to be the result of the voters enacting Proposition 2½ amount to 'new and unforeseen conditions' . . . ." *Castro et al. v. Beecher et al.*, 522 F.Supp. at 877. It ruled that, in light of the remedial objective of both consent decrees,

> namely bringing minority representation up to a level approximating the percentage of the total population which the minorities represent in the community, . . . if anything similar to Proposition 2½ had been in effect at the time that the remedial decrees were entered, these decrees would have been fashioned to make allowances for terminations so that the minority representation on both departments could have been maintained if not increased notwithstanding the then hypothetically ongoing terminations.

*Id.*

The court also concluded that the denial of the relief sought would reverse the results of the court's prior remedies, would "allow the substantial eradication of all progress made by blacks and hispanics" in securing positions as police officers and fire fighters, and would produce a "grievous wrong." *Id.* Accordingly, the Boston Police Commissioner and Fire Commissioner were enjoined from reducing, "pursuant to any departmental or city program of reduction in force on account of lack of funds or abolition of position," the percentage of minority officers below that obtaining at the commencement of the program. *Id.* at 877–78. Neither the Police Commission nor the Fire Commissioner has appealed.

## I. *THE COURT'S POWER TO REVISE THE CONSENT DECREE*

We initially determine whether the district court was empowered to modify its prior remedial orders because of the impending layoffs. At the outset we note that defendants settled both the police case, filed originally under sections 1981 and 1983, and the fire case, commenced under these sections as well as Title VII, by entering into remedial consent decrees. They did so only after the liability issues had been extensively litigated, resulting in well-supported determinations at the district and circuit levels (with certiorari having been sought and denied in the fire case), that defendant's certification and recruiting procedures were discriminatory because they had produced an underrepresentation of blacks and hispanics in the police and fire departments, and that these procedures lacked justification in terms of job-relatedness. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158.

The first question is whether *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), bar the relief ordered because intentional discrimination was not proved. We find no bar. It is by no means clear that our decisions in the police and fire cases should have been different had they been decided after *Washington v. Davis* and *Arlington Heights*, but in any event the pattern of relief which the present modifications in the decrees seek to preserve was conclusively established prior to those decisions. Neither case stands in the way of the district court's modification of the consent decree. *Sarabia v. Toledo Police Patrolman's Ass'n*, 601 F.2d 914, 919 (6th Cir. 1979); *Bolder v. Penn. State Police*, 73 F.R.D. 370, 371–72 (E.D.Pa.1976).

We have carefully reviewed the original complaints, the language contained in the decrees, and all district and circuit court opinions in these cases. We can only conclude that the purpose of the decrees and the intervening orders was to eliminate the present and continuing effects of defendants' past discrimination. We reject appel-

lants' contention that the original decrees and subsequent modifications limit relief to correcting features of the certification process found to have violated plaintiffs' constitutional rights as to hiring. These cases encompass the overall issue of shaping ongoing relief so as to eliminate the *condition* precipitating the original decrees: gross discriminatory underrepresentation of persons in the fire and police departments who are not members of the "prevailing white culture." [9] *Castro v. Beecher,* 459 F.2d 725, 729–31 (1st Cir. 1972); *see Milliken v. Bradley,* 418 U.S. 717, 744, 94 S.Ct. 3112, 3126, 41 L.Ed.2d 1069 (1974); *Swann v. Charlotte-Mecklenberg Bd. of Educ.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971); *cf. Evans v. Buchanan,* 582 F.2d 750, 768 (3d Cir. 1978) (in banc), *cert. denied,* 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278, *reh'g denied,* 447 U.S. 916, 100 S.Ct. 3004, 64 L.Ed.2d 865 (1980).

The district court based its authority to reshape the consent decrees on its finding that the dramatic reduction in minority representation in these departments constituted a showing of a "grievous wrong evoked by new and unforeseen conditions," citing the Supreme Court in *United States v. Swift,* 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932). *Swift* involved an antitrust *defendant* that sought to avoid its obligations pursuant to a consent decree due to changed market conditions. Perhaps a more apt standard was set out by the Supreme Court in *United States v. United Shoe Corp.,* 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), wherein *plaintiffs* in an antitrust dispute sought revision of their remedy designed to produce "workable competition." *Id.* at 249, 88 S.Ct. at 1499. There, the Court held that modification was appropriate because time and experience had demonstrated that the decree had failed to accomplish its intended result. *Id. See also System Federation v. Wright,* 364 U.S. 642, 647, 81 S.Ct. 368, 371, 5 L.Ed.2d

349 (1961). In any event there can be no question of the power of a court of equity, upon a sufficient showing, "to modify an injunction in adaptation to changed conditions though it was entered by consent." *United States v. Swift,* 286 U.S. at 114, 52 S.Ct. at 462. Here, there was ample showing that changed circumstances would totally vitiate the intended effect of the original decrees unless the proposed modifications were made.

Nor do we think that plaintiffs should be penalized for failing, in negotiating the decrees, to have foreseen the unprecedented change in state and local fiscal policy resulting in the extensive layoff programs. We agree with the district court that, had the parties anticipated any measure such as Proposition 2½, they would have incorporated some provision addressing its potential impact into the decrees. Failure to take the action here challenged would result in undoing most all that had been accomplished by the original decrees.

The Sixth Circuit's treatment of a virtually identical layoff situation in *Brown v. Neeb,* 644 F.2d 551 (6th Cir. 1981), lends considerable support to our conclusion that modification was within the court's power. In *Brown,* findings of prior illegal discrimination by the Toledo Fire Department formed the predicate of a consent decree entered into by the city, which set as a goal that the city "achieve within 5 years a fire department which reflected the racial composition of the city as a whole." *Id.* at 555. The Sixth Circuit upheld the district court's authority to order the same type of modification of the original decree as in this case, reasoning that the language in the decree, although silent as to the effect of layoffs, and the circumstances surrounding the entry of the decree, compelled the conclusion that the "city agreed that it had a constitutional duty to eliminate discrimination in the hiring of firefighters." *Id.* at 562–63.

**9.** Prior orders and stipulations in both cases have dealt with matters going beyond civil service certification measures, including employment of provisional employees, recruiting, appointment targets, rejection of applicants, the effects of statutory preferences for veterans and local residents, mental and physical testing, and firing. *See, e.g.,* 371 F.Supp. at 521–22; 365 F.Supp. at 661–62.

The *Brown* court distinguished its denial of similar relief in *Youngblood v. Dalzell*, 568 F.2d 506 (6th Cir. 1978), because in *Youngblood*, unlike *Brown*, there had been no finding of prior discrimination; the original decree contained language expressly denying that the Cincinnati Fire Department had discriminated in its past hiring practices. *Brown v. Neeb*, 644 F.2d at 561 & n.18.

Here, as in *Brown*, the defendants entered into consent decrees upon "capitulating to judicial findings of past discrimination." *Brown v. Neeb*, 644 F.2d at 562 & n.20; *Boston Chapter, NAACP, Inc. v. Beecher*, April 17, 1975 Interim Consent Decree (fire case), App. at 90–91; *Castro v. Beecher*, 365 F.Supp. at 656. Both decrees contain language that warrants concluding that the certifying and appointing authorities are under an affirmative duty to integrate the police and fire departments until the percentage of blacks and hispanics in both departments approximates that of the general population.[10] In addition, neither decree contains any exculpatory language as in *Youngblood*. And, as in *Brown*, if the district court undertook no modification, the layoffs would have eroded significantly, if not completely destroyed, the affirmative action progress made to date. *See Brown v. Neeb*, 644 F.2d at 560. Under these circumstances, we conclude that the district court had the authority to modify the consent decrees in the light of new and unforeseen conditions.

We next address the issues of whether the relief ordered was proper and constitutional.

**10.** *See, e.g.*, June 27, 1975 Consent Decree (police case), App. at 122–23; April 17, 1975 Interim Consent Decree (fire case), App. at 93.

**11.** Mass.Gen.Laws Ann. ch. 31, § 39 provides in pertinent part:

> If permanent employees in positions having the same title in a departmental unit are to be separated from such positions because of lack of work or lack of money or abolition of positions, they shall, except as hereinafter provided, be separated from employment according to their seniority in such unit and shall be reinstated in the same unit and in the

## II. THE COURT ORDER VERSUS THE MASSACHUSETTS SENIORITY STATUTE

To implement its order prohibiting the Boston Police and Fire Departments from reducing the current level of minority representation, the district court required the maintenance of separate minority and non-minority lists with respect to seniority, reemployment and reinstatement. To this extent, therefore, the district court's order superseded the operation of the reverse seniority layoff provisions of the Massachusetts civil service statute, Mass.Gen.Laws Ann. ch. 31, § 39.[11] Most of the cases dealing with the inherent conflict between affirmative action programs and vested seniority rights have concerned private employers and Title VII. And, until recently, the dispute has mainly centered on hiring and promotion.

There are three Supreme Court cases that focus on the problem of seniority rights and discrimination against minorities. *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and *American Tobacco Co., et al. v. Patterson, et al.*, —— U.S. ——, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982). In *Franks* the district court had found that the employer had discriminated in making hiring, transfer, and discharge decisions, all of which occurred after July 2, 1965, the date on which the prohibition against racial discrimination under Title VII took effect as to private employers. *Franks v. Bowman Transp. Co.*, 424 U.S. at 751, 758, 96 S.Ct. at

> same positions or positions similar to those formerly held by them according to such seniority, so that employees senior in length of service, computed in accordance with section thirty-three, shall be retained the longest and reinstated first. Employees separated from positions under this section shall be reinstated prior to the appointment of any other applicants to fill such positions or similar positions, provided that the right to such reinstatement shall lapse at the end of the five-year period following the date of such separation.

1257, 1261 n.10. The Supreme Court held that section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h) [12] did not "modify or restrict relief otherwise appropriate once an illegal discriminatory practice occurring after the effective date of the Act is proved," *id.* at 761–62, 96 S.Ct. at 1262–63 and "that class-based seniority relief for identifiable victims of illegal hiring discrimination was a form of relief generally appropriate under § 706(g)." *Id.* at 779, 96 S.Ct. at 1271; *accord, Teamsters v. United States*, 431 U.S. at 346–48, 97 S.Ct. at 1860–61; *EEOC v. American Tel. & Tel. Co.*, 556 F.2d 167, 174 (3d Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978); *see Ass'n Against Discrimination v. City of Bridgeport*, 647 F.2d 256, 278 (2d Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981); *Guardian's Ass'n of New York City v. Civil Service*, 633 F.2d 232, 249–54 (2d Cir. 1980), *cert. denied*, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981); *Chance v. Board of Examiners & Bd. of Educ.*, 534 F.2d 993, 1007 (2d Cir. 1976) (*reh'g in banc*), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920 (1977).

In *Teamsters* the Court did not retreat from the rule set forth in *Franks*, but dealt instead with the effect of section 703(h) on awarding retroactive seniority to redress prior discrimination that had occurred both before and after the effective date of Title VII. The district court in *Teamsters* had found that the employer had discriminated by implementing hiring, assignment and promotion policies that caused black and hispanic employees to occupy the lower paying and less desirable jobs. 431 U.S. at 329–31, 97 S.Ct. at 1851–52. As to those plaintiffs claiming that they had been discriminated against after the effective date

of Title VII, the Court stood firm on its *Franks* ruling. *Id.* at 347, 97 S.Ct. at 1860. But the Court denied relief to those plaintiffs alleging discrimination that occurred prior to the effective date of the Act and held that an "otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination." *Id.* at 353–54, 97 S.Ct. at 1863–64.

The most recent case, *American Tobacco Co. v. Patterson*, —— U.S. ——, 102 S.Ct. 1534, 71 L.Ed.2d 748, dealt with the question whether § 703(h) applied to seniority systems adopted after the effective date of Title VII, July 2, 1965. After an exegesis of the statutory history of Title VII, the Court concluded that § 703(h) immunizes a bona fide seniority system whenever adopted unless intentional discrimination was proven. *Id.* at ——, 102 S.Ct. at 1541. *American Tobacco Co.* did not explicitly overrule the holding of *Franks* that § 703(h) does not bar appropriate relief if an illegal discriminatory practice occurring after the effective date of the Act is proved.

We find nothing in this trilogy that precludes a court from ordering relief to remedy discrimination that exists apart from the adoption or application of a bona fide seniority system. The original consent decrees in the cases before us, decided long before the Supreme Court cases, were directed at such independent violations, the use of discriminatory certification examinations. None of the Supreme Court cases apply to the basic issue at stake here; the power of a court in a litigated discrimination case to ensure that relief already or-

---

**12.** Relevant portions of § 703(h) of Title VII provide:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin.
42 U.S.C. § 2000e–2(h).

dered not be eviscerated by seniority-based layoffs. To hold a seniority system inviolate in such circumstances would make a mockery of the equitable relief already granted.

Two recent Second Circuit cases are analogous to our situation. *Guardians Ass'n v. Civil Service*, 633 F.2d 232 (2d Cir. 1980), *cert. denied*, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981), was an action brought under Title VII, Title VI and 42 U.S.C. § 1981 by black and hispanic members of the New York City Police Department, alleging that layoffs carried out pursuant to a last hired, first fired plan were discriminatory because the Department's entry examinations administered during the years 1968 to 1970 were discriminatory, and that but for such discrimination plaintiffs would have been hired earlier and thus would have accrued sufficient seniority to withstand being fired. The court upheld the district court's findings that the entry examinations were discriminatory and held that the use of such tests as late as 1974 violated Title VII. It held that § 703(h) did not "immunize post-Act hiring on the basis of an eligibility list reflecting performance on pre-Act discriminatory examinations." *Id.* at 253. In *Association Against Discrimination v. City of Bridgeport*, 647 F.2d 256 (2d Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982), the Second Circuit affirmed its holding in *Guardians* that a municipality could be held liable under Title VII for post-Act hiring based on a pre-Act discriminatory hiring list. *Id.* at 272–74.

■ It is now settled that remedies to right the wrong of past discrimination may suspend valid state laws. *Carter v. Gallagher*, 452 F.2d 315, 328 (8th Cir. 1961) (*reh'g in banc*), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); *United States v. Mississippi*, 339 F.2d 679 (5th Cir. 1964); *United States v. Duke*, 332 F.2d 759 (5th Cir. 1963). *See generally* Note, *Last*

*Hired, First Fired Layoffs and Title VII*, 88 Harv.L.Rev. 1544, 1557–60 (1975).

■ We emphasize that the district court orders do not completely nullify the seniority statute. Nor do they mandate the firing of any particular employees. The orders allow the statute to be followed so long as the level of minority representation is not reduced beyond that which prevailed at the time the personnel reductions began. The order was designed to operate within the framework of the statute, although modifying it to the extent necessary to preserve the integration already achieved.

We hold that the court's orders prevail over the Massachusetts seniority statute.

### III. THE CONSTITUTIONALITY OF THE ORDERS

Appellants argue that the orders discriminate against nonminorities and thus are unconstitutional.[13] We first define the issue. This case does not involve an award of constructive seniority to individuals who have been discriminated against; the orders require that there be a certain percentage of minorities on the Police and Fire Departments without regard to whether the individuals comprising the minority percentage were the actual victims of past discrimination.

We turn to the Supreme Court cases, in addition to those already discussed, bearing on the issue. The first case is *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286–87, 96 S.Ct. 2574, 2581–82, 49 L.Ed.2d 493 (1976), which held that section 1981 protects whites as well as blacks from racial discrimination in private employment.

Next came *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). A divided court upheld so much of the judgment of the Supreme Court of California declaring the University's special admission program based on racial quotas unlawful. *Id.* at 270–71, 98 S.Ct. at 2737–38. It reversed,

---

**13.** As a threshold matter, we find that appellants did preserve the reverse discrimination argument for appeal by suggesting the applicability of the reasoning in *Chance v. Board of* *Examiners & Bd. of Educ.*, 534 F.2d 993 (2d Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977), at the July 30, 1981 hearing before Judge Caffrey.

however, that portion of the California court's judgment enjoining the University from according any consideration to race in its admission process. *Id.* at 272, 99 S.Ct. at 2738.

*United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480, *reh'g denied,* 444 U.S. 889, 100 S.Ct. 193, 62 L.Ed.2d 125 (1980), comes closer to our problem. In *Weber* the Court held that Title VII does not bar voluntary, private affirmative action undertaken by an employer in collaboration with a union, even when the plan is racially preferential or accomplished through a quota, so long as the plan is directed to eliminating "conspicuous racial imbalance in traditionally segregated job categories." *Id.* at 208–09, 99 S.Ct. at 2729–2730. Although the court declined to "define in detail the line of demarcation between permissible and impermissible affirmative action," *id.* at 208, 99 S.Ct. at 2729, it noted that "the plan does not unnecessarily trammel the interests of the white employees. The plan does not require the discharge of white workers and their replacement with new black hirees." *Id.*

The fourth Supreme Court case that bears, albeit tangentially, on the issue is *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). This case upheld the power of Congress to require in a congressional spending program that "10% of the federal funds granted for local public works projects must be used by the state or local grantee to procure services or supplies from businesses owned and controlled by members of statutorily identified minority groups." *Id.* at 453, 100 S.Ct. at 2762.

■ Although these decisions issued from a sharply divided court and were marked by separate concurrences and dissents, we think it is now firmly established that remedial relief for the effects of past discrimination need not be color-blind and that the use of minority-conscious percentage goals and quotas to overcome the present and ongoing effects of past discrimination is constitutionally permissible. *See United States v. City of Miami, Fla.,* 614 F.2d 1322, 1335 (5th Cir. 1980) and cases cited therein. We also think that *Weber* implicitly approves the use of such remedies in sections 1981 and 1983 cases as well as Title VII cases. *See Setser v. Novack Inv. Co.,* 657 F.2d 962, 966–67 (8th Cir. 1981) and cases cited therein.

■ None of the other Supreme Court cases, however, involve public employment nor address directly the situation before us; the conflict between a last hired, first fired seniority system and court orders seeking to maintain some semblance of racial balance in municipal Police and Fire Departments. There is no blinking the fact that there is significant difference between hiring and promoting in accord with a race-conscious ratio and insulating from discharge a percentage of employees because they are members of a minority group. In the former situation, there is only a postponement of expectations; in the layoff situation, employees with greater seniority lose their jobs. *See Detroit Police Officers' Ass'n v. Young,* 608 F.2d 671, 696 n.12 (6th Cir. 1979); Judge Skelly Wright, *Color-Blind Theories and Color Conscious Remedies,* 47 U.Chi.L.Rev. 213, 238–40 (1980).

We do not think the issue can be resolved by simply following the Title VII cases and awarding constructive seniority to those minority members of the departments that can show that they were discriminated against by the entry examinations given in 1968–1970. This is not an action for damages. The relief sought originally was not for individuals, but to correct a condition of racial imbalance. We do not know the exact effect the award of constructive seniority to the identifiable victims of the past discrimination would have on the minority percentages of the departments. Considering, however, that more than ten years have passed, we do know that such a limited remedy would result in minority ratios far below that set by the district court.[14]

14. In response to an inquiry at oral argument, we have been informed that the earliest seniority date of minority police officers laid off is

It must be stressed that the orders here do not require the continuation of the affirmative action programs by the hiring of minorities and the firing of whites. All they do is preserve the status quo at a 14.7 percent minority ratio for fire fighters and an 11.7 percent for policemen. Against a background of a present 30 percent minority population in Boston, this hardly can be deemed overreaching. Nor do we think it can fairly be characterized as "unnecessarily trammeling" the interests of the whites. *United States v. Weber*, 443 U.S. at 208, 99 S.Ct. at 2729. The fact of past discrimination agreed to in both cases constitutes a "compelling need" for a minority-conscious remedy. The proper test is one of reasonableness. *See Morgan, et al. v. O'Bryant, et al.*, 671 F.2d 23, 28 (1st Cir. 1982). The orders of the district court meet the test of reasonableness. They were necessary to prevent the departments from regressing to the state of precipitous racial imbalance that prevailed at the commencement of this litigation more than ten years ago.

We are acutely aware that some white policemen and fire fighters who, understandably, regard the seniority system as an inalienable right and who have been innocent themselves of any discrimination will lose their jobs, at least temporarily.[15] We also must recognize that whites as a group reaped significant advantages in the past in hiring and promotion at the expense of blacks and hispanics and that a last hired, first fired seniority system perpetuates the past exclusion of minorities. This is not a case of wrong or right; it is a case of two competing rights, earned seniority versus racially balanced police and fire departments.

An important factor in these cases is that they involve the police and fire departments of a large metropolitan city that now has a minority population of at least 30 percent. We are concerned here not with simply redressing the rights of individuals who suffered racial discrimination; the issue is whether the progress made to date in integrating the departments will be preserved. As Judge Wyzanski noted, the public interest requires a racially balanced police force. *Castro v. Beecher*, 365 F.Supp. at 660. We do not need expert testimony to make the point that, unless the public safety departments of a city reflect its growing minority population, there is bound to be antagonism, hostility and strife between the citizenry and those departments. The inevitable result is poor police and fire protection for those who need it most.

The argument that police need more minority officers if not simply that blacks communicate better with blacks or that a police department should cater to the public's desires. Rather, it is that effective crime prevention and solution depend heavily on the public support and cooperation which result only from public respect and confidence in the police. In short, the focus is not on the superior performance of minority officers, but on

June 1980, and the earliest seniority date of laid-off white police officers is December 30, 1970. We have also been told that of the 258 police officers laid off, 34 are minority and that if it were not for the order of the district court, 130 minority officers, 126 white officers, and 2 oriental officers would have been laid off. As a result of the order, 81 minority officers were recalled so as to maintain the 11.7% minority representation in the department. On a percentage basis, the district court's order means that a little more than 13% of those laid off are members of the minority group.

15. If a fire fighter or police officer with permanent civil service status is laid off as a result of a reduction in force, that individual will be placed on reemployment lists by the Director of Personnel Administration. A reemployment list establishes for a laid-off fire fighter or police officer the right to be certified to all municipalities for a period of two years from his layoff, ahead of all other persons eligible for appointment as police officers or fire fighters. Mass.Gen.Laws Ann. ch. 31, § 40. In addition, a police officer or fire fighter has the right to be reinstated to a vacancy within the department from which he was laid off for five years after the date of his termination—again with preference over all other eligible applicants. Mass. Gen.Laws Ann. ch. 31, § 39.

The probable extent of recalls in both departments is not yet clear, although some evidence does exist that in fact reinstatement of at least some of the laid-off employees has taken place or will occur.

the public's perception of law enforcement officials and institutions.

*Detroit Police Officer's Ass'n v. Young*, 608 F.2d 671, 696 (6th Cir. 1979).

It is significant that the only circuit case directly on point, *Brown v. Neeb*, 644 F.2d at 564, held: "To the extent that the seniority system is an obstacle to the city of Toledo's duty to eliminate past discrimination the district court can set it aside."

We find no constitutional bar. It is now accepted that minority-conscious quotas can be used as a tool to prevent discrimination and to advance integration of the work force in hiring and promotion situations. The imposition of constructive seniority to offset the effects of a last hired, first fired system has been used with increasing frequency since *Franks* in Title VII cases. While the orders place a relatively greater share of the burdens of the layoffs upon nonminorities, this does not constitute "reverse discrimination." The layoffs here were bound to cause undeserved injury in any event. While seniority was the normal way to decide who must go first, there is nothing magical about seniority, and here common sense suggests that it should be tempered by other entirely rational considerations so that the racial equity achieved at considerable effort in the past decade not be erased. In *Bakke*, not an employment case, the Supreme Court refused to enjoin the University from giving any consideration to race in its admissions process. It is a simple fact that discrimination against blacks and other minorities was long accepted and condoned in this country. To a minority police officer or fire fighter hired within the last ten years, the imposition of a rigid last hired, first fired seniority system would only mean that once again the dominant white culture had protected its own kind at the expense of blacks and hispanics. If the evil of racial discrimination is to be fought openly, we must not allow ourselves to be caught in a semantic web of aphorisms such as "reverse discrimination" that in the final analysis serve only to perpetuate the discrimination of the past.

We rule that the district court had the equitable power to modify the consent decrees, that the Massachusetts statutory last hired, first fired seniority system is not insulated from the court's orders, and that the orders are not unconstitutional.

*Affirmed.*